IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


ARMOUTH INTERNATIONAL, INC.    )
    )
v.    )    No. 3:14-0567
    )
DOLLAR GENERAL CORPORATION    )
and DOLGENCORP, LLC, a subsidiary of    )
Dollar General Corporation.    )


To: The Honorable William J. Haynes, Senior District Judge


## REPORT AND RECOMMENDATION

By Order entered July 14, 2015 (Docket Entry No. 49),[1] this action was referred to the

Magistrate Judge under 28 U.S.C. § 636(b)(1)(A) and (B) and Rule 72 of the Federal Rules of Civil

Procedure. Presently pending are Defendants' motion for partial summary judgment (DE 39), to

which Plaintiff has filed a response (DE 51) and Defendants have filed a reply (DE 57), as well as

Plaintiff's motion for partial summary judgment (DE 44), to which Defendants have filed a response

(DE 53) and Plaintiff has filed a reply (DE 56). For the reasons set forth below, the Court

recommends that Defendants' motion be GRANTED IN PART and DENIED IN PART, and that

Plaintiff's motion be DENIED.

---

[1] Docket Entry references will hereinafter be identified as "DE" followed by the corresponding Docket Entry number.

# I. BACKGROUND

In early 2010, Plaintiff Armouth International, Inc. ("Armouth") entered into a business relationship with Defendants Dollar General Corporation and Dolgencorp, LLC (collectively referred to as "Dollar General"), in which Armouth supplied Dollar General with scrub tops, scrub pants, bandanas, handkerchiefs, and other seasonal apparel. DE 53-15 at 1. In both April and August of 2011, Dollar General placed orders for eighteen styles of scrub tops, with delivery of such items to commence in early 2012. *Id.* at 2. These orders were placed while Lynn Derry was the Vice-President and Divisional Merchandise Manager ("DMM") over scrubs at Dollar General. *Id.* Ms. Derry resigned sometime in late August or early September, and was replaced by Cindy Long on October 17, 2011. *Id.*

Dollar General purchases goods from suppliers in two ways: "core" purchases (also known as "replenishment") and "non-core" purchases. *Id.* at 4. Core purchases involve the purchase of goods that Dollar General physically stores in its distribution centers to ensure that its retail stores can remain stocked with such goods, while non-core purchases generally involve a one-time purchase of goods that are not replenished from its distribution centers on a regular basis. *Id.*

As part of its business relationship with Dollar General, Armouth was required to agree to a "Domestic Vendor Guide," prepared by Dollar General, which contained the following language:

> UNDER NO CIRCUMSTANCES SHALL DOLLAR GENERAL OR ITS
> AFFILIATES BE LIABLE TO VENDOR OR ANY THIRD PARTY FOR ANY
> CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL OR PUNITIVE
> DAMAGES, LOSS OF BUSINESS PROFITS OR REVENUE, BUSINESS
> INTERRUPTION, LOSS OF BUSINESS INFORMATION OR OTHER
> PECUNIARY LOSS ARISING FROM OR RELATED TO THIS AGREEMENT OR
> ANY ORDERS AND/OR PRODUCTS, WHETHER SUCH LIABILITY IS BASED
> ON CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY)
> OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH

> DAMAGES. DOLLAR GENERAL'S LIABILITY ARISING FROM OR
> RELATING TO THIS ORDER SHALL NOT EXCEED, IN THE AGGREGATE,
> THE PURCHASE PRICE FOR THE PRODUCTS ORDERED DURING THE
> THREE (3) MONTH PERIOD ENDING ON THE DATE THAT A CLAIM OR
> DEMAND IS FIRST ASSERTED.

DE 52 at 2-3. Armouth was also required to issue a "Quote Sheet" to Dollar General for each item it sold to Dollar General.[2] *Id*. at 1. The language in each Quote Sheet included essentially identical language to that contained in the Domestic Vendor Guide, including the exclusion of incidental and consequential damages, as well as the limitation of recovery to the purchase price of the goods ordered during the three-month period preceding the date on which a claim or demand is asserted. *Id*. at 2. After receiving each Quote Sheet, Dollar General would then issue a "Purchase Order" to Armouth that represented the final writing between the parties and confirmed Dollar General's purchase of the goods from Armouth. DE 51 at 2-3. Each Purchase Order included a merger clause stating that, "[t]his Order constitutes the complete and exclusive understanding and agreement of the parties and supersedes all prior understandings and agreements, whether written or oral, with respect to the subject matter hereof." DE 39-2 at 27. Additionally, each Purchase Order contained language limiting Dollar General's liability, including the exclusion of incidental and consequential damages, but did not include the three-month temporal limitation contained in the Domestic Vendor Guide and Quote Sheet:

> IN NO EVENT SHALL [DOLLAR GENERAL] BE LIABLE TO [ARMOUTH],
> REGARDLESS OF THE FORM OF ACTION, FOR ANY INCIDENTAL,
> INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OR LOST PROFITS,
> OF ANY NATURE WHATSOEVER. UNDER NO CIRCUMSTANCES SHALL
> [DOLLAR GENERAL]'S LIABILITY ARISING FROM OR RELATING TO THIS

---

[2] Armouth does not dispute that each item it sold to Dollar General included a Quote Sheet. Armouth asserts, however, that "not all items that were contracted for purchase had a Quote Sheet." DE 52 at 1.

ORDER EXCEED, IN THE AGGREGATE, THE PURCHASE PRICE FOR THE GOODS OR SERVICES ORDERED HEREUNDER.

DE 52 at 3. It is undisputed that Armouth agreed to do business with Dollar General subject to the terms of the Domestic Vendor Guide, the Quote Sheet, and the Purchase Orders. *Id*.

Shortly after beginning her role as Vice-President and DMM, Cindy Long expressed concern that Dollar General had "so much inventory," and was dissatisfied with the prices agreed to in the Purchase Orders involving the scrub tops supplied by Armouth. DE 53-15 at 3. On November 30, 2011, pursuant to an email from Dollar General employee Laura Darden, Dollar General cancelled the aforementioned Purchase Orders for scrub tops. *Id*. On January 18, 2012, via email from Ms. Long, Dollar General advised Armouth that it would only purchase the scrub tops through its replenishment program. *Id*. at 4. Ms. Long further advised Armouth that the "commitments you received from Lynn [Derry] should fill our need," and that Dollar General would "pull them as needed." *Id*.

In addition to scrub tops, Dollar General agreed to purchase scrub bottoms[3] from Armouth. On October 7, 2011, Jim Lorenz with Dollar General sent an email to Charles Armouth requesting confirmation that Armouth would be able to deliver a certain amount of scrub pants by January 15, 2012.[4] DE 42-6 at 3-4. This amount included 664,608 units purchased pursuant to a Purchase Order, as well as 682,890 units that represented Dollar General's "suggested back-up" quantity that would be purchased if the Purchase Order quantity sold well. *Id*. Mr. Lorenz further stated that once

---

[3] The parties also refer to scrub bottoms as "scrub pants."

[4] Although the emails identify this individual as "Charles Armouth," DE 42-6 at 2, the deposition transcript indicates that his name is actually "Charles Armouth Levy." DE 39-9 at 1. For purposes of clarity, the Court will hereinafter refer to this individual as "Charles Armouth" or "Mr. Armouth."

Armouth provided confirmation and Quote Sheets for the order, Dollar General would "get orders to [Armouth] for this Domestic Core program straight away." *Id*. at 3. On October 10, 2011, Mr. Armouth responded via email that Armouth could deliver the planned set order of 664,608 units by February 15, 2012. *Id*. He also stated that Armouth could deliver half of the suggested back-up quantity (341,445) by March 15, and the other half by April 15. *Id*. He further requested that Mr. Lorenz "please give [Armouth] your green light" in order to start production. *Id*. Mr. Lorenz responded on October 11, 2011 by stating, "[t]hank you for your commitment to the 664k for the roll-out. Please send the ship to sea!" DE 53-15 at 7. However, Mr. Lorenz also requested that Armouth provide half of the "suggested back-up" by the beginning of March and the other half by the beginning of April. *Id*. Mr. Armouth responded by thanking Mr. Lorenz for his confirmation of the order and stating, "I'll do my level best and I believe I'll be able to advance the back up quantities to March 1 and April 1." DE 42-6 at 2.

On October 26, 2011, Laura Darden sent an email to Mr. Armouth advising that she "need[ed] to re-look at this [scrub pants] program under the direction of [Ms. Long]. There are concerns about our turns, and we are worried about compounding it with excessive inventory on a core replenishment program." DE 53-15 at 8. In a response email, Mr. Armouth advised that Armouth would need to ship the scrub pants order by the end of December in order to meet Dollar General's February 15, 2012 target date for the 664,608 Purchase Order amount. *Id*. On October 27, 2011, Mr. Lorenz wrote the following to Mr. Armouth:

Keep in mind that my commitment was to place orders for ~650k [units][5] to set stores and shore up DCs[6] in February, knowing that [Dollar General's] suggestion/expectation was for Armouth to carry another ~600k [units][7] (to get to the ~1.3M [units] below). How much and the timing of the replenishment orders for the Armouth ~600k [units] is driven solely by sales; which leads to demand and, therefore, orders. Just keeping it all on the up and up.

*Id.*; DE 42-7 at 2-3. Mr. Armouth responded by stating that he was "extremely familiar with replenishment [a]nd the way it usually works," and that he was not worried about the suggested back-up amount. DE 42-7 at 2.

On January 5, 2012, Mr. Lorenz wrote an email to Mr. Armouth stating that he had "laid [his] neck and job on the line" in order to protect the scrub bottom program. DE 53-15 at 9. He also requested a revision in the amount and expected delivery dates for the scrub bottom units. DE 42-8 at 2-3. Mr. Lorenz requested that Armouth deliver 468,454 units by January 30, 2012, as part of the Purchase Order quantity, instead of the 664,608 amount to be delivered by February 15, 2012.[8] *Id.* He requested confirmation from Mr. Armouth that this revision could be accommodated. *Id.* He also revised the "suggested back-up" amount from 682,890 to 196,156, to be delivered by March 23, 2012.[9] *Id.* Finally, he requested "[o]verall flow of goods after these 700k." *Id.* The "700k" figure

---

[5] This appears to represent the 664,608 Purchase Order amount.

[6] Although this abbreviation is not explained, the Court assumes that "DCs" refers to Dollar General's distribution centers.

[7] This appears to represent the 682,890 "suggested back-up" amount.

[8] Mr. Lorenz embedded a spreadsheet in the email that contained a column for "Revised Current [Purchase Order] Qty initial," under which the 468,454 total amount was placed. DE 42-8 at 3.

[9] Although there is no specific request for delivery of the revised quantity of back-up units by March 23, 2012, the spreadsheet embedded by Mr. Lorenz suggests that this was his request. DE 42-8 at 2-3.

appears to represent the combination of the 468,454 revised Purchase Order amount and the 196,156 revised back-up amount (totaling 664,610 units). Mr. Armouth responded on January 6, 2012, that the revised 468,454 quantity could be shipped on February 6, 2012, and that the revised 196,156 amount could be shipped by February 15, 2012. DE 53-15 at 10; DE 42-8 at 2. Mr. Armouth also advised that the remaining quantity of scrub bottoms, approximately 600,000, would be available on March 1. *Id*.

Armouth states that Dollar General "accepted the initial quantities of scrub pants," *id*., but does not provide a specific amount. Dollar General admits that it received a "substantial quantity of scrub pants" from Armouth, but denies that it ever committed to accepting the 1,347,498 total discussed in Mr. Lorenz's October 7, 2011 email. *Id*. On June 5, 2012, Ms. Darden emailed Mr. Armouth to request a return of 118,757 units of evergreen-colored scrub pants. *Id*. at 12. Mr. Armouth denied this request and later informed Ms. Long that Armouth was still holding an additional 209,040 units of evergreen-colored scrub pants. *Id*. at 13. In response, Ms. Long advised Mr. Armouth Dollar General would "not be replenishing the evergreen pant." *Id*.

Several months later on April 29, 2013, counsel for Armouth, David Farbman, sent a letter to Robert Stephenson, Assistant General Counsel to Dollar General, which alleged that Dollar General owed outstanding debts for goods purchased, including $519,563.40 for headwear, $125,394 for scrubs, and $10,692 for capris. DE 52 at 3-4. The parties failed to resolve the issue and suit was filed in February of 2014. Both parties filed motions for partial summary judgment on July 2, 2015, DE 39; DE 71, which are discussed in detail below. It is not disputed that Tennessee law controls in this matter.

## II. STANDARD OF REVIEW

A motion for summary judgment is reviewed under the standard that summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986). A "genuine issue of material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986). Unlike ruling on a motion to dismiss, in considering whether summary judgment is appropriate, the Court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir.), *cert. denied*, 531 U.S. 875, 121 S. Ct. 179, 148 L. Ed.2d 123 (2000). In reviewing a motion for summary judgment, the Court must view the evidence and all inferences drawn from the underlying facts "in the light most favorable to the party opposing the motion." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed.2d 538 (1986); *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir.), *cert. denied*, 534 U.S. 896, 122 S. Ct. 217, 151 L. Ed.2d 155 (2001).

The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 249-50. However, "[t]he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.'" *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 325). "Once the moving party has presented evidence sufficient

to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed.2d 695 (1990). That is, in order to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Dollar General's Motion for Partial Summary Judgment

Dollar General asks the Court to enter an order finding the following: (1) that Armouth may not recover any incidental or consequential damages from Dollar General; (2) that Armouth's damages, if any, are temporally limited to the price of goods ordered between January 29, 2013 and April 29, 2013; and (3) that Armouth's unjust enrichment claim fails as a matter of law because of the valid and enforceable contracts between the parties. DE 39 at 1; DE 39-1 at 1-2.

Dollar General's motion centers on the validity of the language in its written agreements with Armouth pertaining to damages. As discussed *supra*, both the Quote Sheets and Purchase Orders agreed to by the parties contain language limiting Dollar General's liability. Each Quote Sheet limits

Dollar General's liability to the "purchase price for the products ordered during the three (3) month period ending on the date that a claim or demand is first asserted." DE 52 at 2. Each Purchase Order limits Dollar General's liability to the "purchase price for the goods or services ordered hereunder." *Id*. at 3. The Purchase Order does not, however, include any temporal limitation. Both the Quote Sheet and the Purchase Order state that Dollar General shall not be liable to Armouth for any incidental or consequential damages. *Id*. at 2-3. It is undisputed that Armouth agreed to do business with Dollar General subject to the terms of the Quote Sheets and the Purchase Orders. *Id*.

The Quote Sheets and Purchase Orders contain clear and unambiguous language limiting Dollar General's liability. Armouth attempts to overcome this by arguing that the three-month damages limitation improperly circumvents the statute of limitations or, alternatively, that the three-month limitation is unconscionable. DE 51 at 5-8. Armouth also argues that it is inappropriate for the Court to limit damages at the summary judgment stage. *Id.* at 8. The Court is unpersuaded by these arguments. For one, Armouth appears to misinterpret the effect of a temporal limitation with respect to damages, as this has no bearing on the applicable statute of limitations. Dollar General correctly points out that Armouth brought the current action over two years after the alleged breach of contract in November of 2011. DE 1. The temporal limitation simply creates a time frame on which to base a calculation of damages.

Additionally, although Armouth claims that the three-month limitation "fails its essential purpose and is unenforceable," DE 51 at 6, the Tennessee Court of Appeals has held that a party who signs a printed form provided by the other party to a transaction "will be bound by the provisions in the form over which the parties actually bargained and such other provisions that are not unreasonable in view of the circumstances surrounding the transaction." *Contour Med. Tech., Inc.*

*v. Flexcon Co.*, No. 01A01-9707-CH-00315, 1998 WL 242609, at *5 (Tenn. Ct. App. May 6, 1998). Neither party has provided, nor has the Court been able to locate, any Tennessee case law pertaining specifically to contractual provisions that limit the calculation of a party's damages to a specific time frame. However, the Sixth Circuit has stated that unconscionability in a contract rarely exists unless one of the parties is a consumer. *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427, 435 (6th Cir. 1983). Tenn. Code. Ann. § 47-2-719(3) also explicitly permits the limitation or exclusion of consequential damages in a contract unless the exclusion is unconscionable. Such a limitation is *prima facie* unconscionable "in the case of consumer goods," but is not if the loss in question is commercial, as is the case here. *Id.* Additionally, the Tennessee Court of Appeals has affirmed a trial court's decision to grant summary judgment regarding the validity of a contract between commercial parties that excludes both incidental and consequential damages. *Contour Med. Tech., Inc. v. Flexcon Co.*, 1998 WL 242609, at *3. The Court provided the following rationale for its holding:

> We are dealing with a transaction between commercial entities, sophisticated parties that buy and sell goods with regularity. Limitation of damages clauses are part of the world in which they operate; they are expressly approved by the bible of commercial transactions, the Uniform Commercial Code. Therefore, we cannot say that the terms were unreasonable.

*Id.* In this case, Armouth voluntarily agreed to contractual terms that significantly, though not unfairly, limited their recovery of damages. This decision was made according to Armouth's business acumen and discretionary judgment. Courts should be "cautious about imposing a set of morals on the commercial marketplace." *SecurAmerica Bus. Credit v. Schledwitz*, No. W2012-02605-COA-R3CV, 2014 WL 1266121, at *29 (Tenn. Ct. App. Mar. 28, 2014) (internal citation omitted). In line with this reasoning, the Court finds that the both the Quote Sheets and Purchase

11

Orders, including the provisions excluding recovery of incidental and consequential damages and limiting Armouth's recoverable damages to the purchase price of goods ordered during the three months preceding the date on which a claim is first asserted, represent valid and enforceable contracts. While such provisions clearly favor Dollar General in this scenario, "[p]arties engaged in a commercial transaction pursue their own self-interest and understand and expect that the parties with whom they are dealing are doing likewise." *Id.*, at *28 (internal citations omitted).

Despite the foregoing analysis, there appears to be a lack of substantive discussion regarding an equally pertinent issue, which is whether Dollar General and Armouth entered into valid and enforceable contracts for *all* of the goods in question. It is undisputed that Dollar General issued Purchase Orders for scrub tops. DE 53-15 at 2. Because the Court finds that the Purchase Orders represent valid and enforceable contracts, any award of damages for scrub tops for which Purchase Orders were issued would be limited to the purchase price of the goods involved, and Armouth would be precluded from recovering incidental or consequential damages. The Court similarly finds that the three-month damages limitation contained in the Quotes Sheets represents a valid and enforceable provision, therefore any damages for goods that were contracted for by way of a Quote Sheet, but not a Purchase Order, would be limited accordingly. The parties dispute, however, whether all of the goods purchased by Dollar General included Quote Sheets. Dollar General claims that Quote Sheets were issued "for every order or alleged order at the center of this lawsuit." DE 39-1 at 2. In support of this claim, Dollar General points to the deposition of Armouth employee Sean McManus, which included the following exchange:

> Counsel:     When you say there could be quote sheets, do you agree that there is always a quote sheet for every sale that's made by Armouth to Dollar General?

| McManus: | For this case there was. |
|----------|--------------------------|

. . .

| Counsel: | Okay. Do you agree that all the terms of this [Quote Sheet] applies [sic] to the particular sales that were made between Dollar General and Armouth? |
|----------|--------------------------|

. . .

| McManus: | Yes. There's information on here covering each size, each color, each print, the ordering UPC number, which would have been the price ticket information, information about our warehouse, contact information for our company. There was important information on these documents. |
|----------|--------------------------|

DE 39-2 at 3-5. Despite this testimony, Armouth contends in response to Dollar General's statement of undisputed material facts that "not all items that were contracted for purchase had a Quote Sheet." DE 52 at 1. In a footnote contained in its response to Dollar General's motion, Armouth claims that it "has a contract outside the typical route . . . for scrub pants." DE 51 at 3, n.3. This alleged contract formation ostensibly refers to the October 2011 email exchange between Jim Lorenz and Charles Armouth, discussed *supra*. Dollar General, however, points to the October 10, 2011 email in which Mr. Armouth states, "[another Armouth employee] will follow this email with all the required quote sheets." DE 53 at 4; DE 42-6 at 3,[10] thus suggesting that all transactions referenced in the October email thread included Quote Sheets.

Viewing the facts in the light most favorable to Armouth, the Court sees no evidence that any of the transactions between the parties lacked a Quote Sheet. Dollar General specifically alleges in its motion that "Armouth issued a Quote Sheet to Dollar General for every order or alleged order at

---

[10] Dollar General incorrectly cites to exhibit 7 to the deposition of Jim Lorenz, 53-8 at 6-7.

the center of this lawsuit." DE 39-1 at 2. Mr. McManus, an Armouth employee,[11] admitted that

Quote Sheets were issued for all transactions between the parties, DE 39-2 at 3-5, including any

agreements regarding scrub pants. Mr. Armouth explicitly discussed the issuance of Quote Sheets

in his October email exchange with Jim Lorenz. DE 42-6 at 3. Despite this evidence, Armouth fails

to even discuss in its response the existence of any agreements between the parties that were not

governed by a corresponding Quote Sheet, other than a footnote stating that it "has a contract outside

the typical route" with respect to scrub pants. DE 51 at 3. Armouth instead devotes a significant

portion of its response to arguing for the unconscionability of the temporal limitation contained in

the Quote Sheets, as well as the "merger clause" found in the Purchase Orders. *Id*. at 1-3. This

discussion does not, however, refute the overwhelming evidence indicating that Quote Sheets were

issued for each item that Armouth sold to Dollar General.

> Tennessee law holds the following regarding a party opposing summary judgment:

> "[W]hen a motion for summary judgment is made [and] . . . supported as provided
> in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may
> not rest upon the mere allegations or denials of [its] pleading," but must respond, and
> by affidavits or one of the other means provided in Tennessee Rule 56, "set forth
> specific facts" *at the summary judgment stage* "showing that there is a genuine issue
> for trial."

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, __ S.W.3d __, 2015 WL 6457768, at *22 (Tenn.

Oct. 26, 2015) (citing Tenn. R. Civ. P. 56.06) (emphasis in original). The nonmoving party must

also "do more than simply show that there is some metaphysical doubt as to the material facts," *id*.

(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.

1348, 1356 (1986)), and must "demonstrate the existence of specific facts in the record which could

---

[11] Sean McManus was Armouth's witness made available pursuant to Fed. R. Civ. P.
30(b)(6).

lead a rational trier of fact to find in favor of the nonmoving party." *Id*. In the instant case, Armouth has pointed to no specific facts in the record regarding any agreements between the parties that did not include a corresponding Quote Sheet. Armouth claims that "not all items that were contracted for purchase had a Quote Sheet," DE 52 at 1, but fails to support this assertion with any evidence. Accordingly, the Court finds that any purchases made or allegedly made by Dollar General that did not include a Purchase Order were governed by the terms and conditions contained in the corresponding Quote Sheet. In light of this finding, Armouth should be precluded from recovering incidental or consequential damages from Dollar General pursuant to the limitation of liability clause contained in both the Quote Sheets and Purchase Orders. DE 52 at 2-3.

Based on the foregoing finding, the Court also finds that Armouth's claim for unjust enrichment should be dismissed. Armouth claims that "[c]ourts routinely hold that both [a claim for breach of contract and a claim for unjust enrichment] can be maintained through trial and resolved by the trier fact," DE 51 at 10, and cites the decision in *Bridgeforth v. Jones*, in which the Tennessee Court of Appeals remanded the trial court's dismissal of a plaintiff's unjust enrichment claim at the summary judgment stage. *Bridgeforth v. Jones*, No. M2013-01500-COA-R3CV, 2015 WL 336376, at *24 (Tenn. Ct. App. Jan. 26, 2015). It is true that the Court of Appeals ruled that, "on remand the trier of fact should first determine whether a valid contract exists between the parties, and, if not, the trier of fact should consider the merits of Plaintiff's claim of unjust enrichment." *Id*. However, the Court of Appeals noted in that case that the trial court had failed to make any findings of fact, but instead "merely stated that no material facts were disputed." *Id*. at *21. This was paramount to the Court of Appeals' ruling, as it specifically found that "material facts are disputed concerning the existence of a contract which precludes summary dismissal of the claims for breach of contract and

unjust enrichment." *Id*. at *1. Conversely, this Court has explicitly found that there is no genuine dispute as to whether the Quote Sheets represented valid contractual agreements, nor any genuine dispute as to whether Quote Sheets were issued for all of the goods in question. As the Court of Appeals noted:

> Courts may impose a contractual obligation under an unjust enrichment theory *if there is no contract between the parties or the contract has become unenforceable or invalid and the defendant will be unjustly enriched unless the court imposes an obligation*.

*Id*. at 19 (emphasis in original). Here, the Quote Sheets constituted enforceable contracts between the parties. Therefore, as a matter of law, Armouth's claim for unjust enrichment fails.

However, the Court does not agree with Dollar General's position that Armouth's damages are temporally limited to the price of goods ordered between January 29, 2013 and April 29, 2013. DE 39-1 at 6-7. Dollar General bases this position on the language of the Quote Sheets, which state that Dollar General's liability shall not exceed the "purchase price for the products ordered during the three (3) month period ending on the date that a claim or demand is first asserted," DE 52 at 2, as well as the April 29, 2013 letter from Armouth attorney David Farbman to Dollar General attorney Robert Stephenson, in which Mr. Farbman claimed that Dollar General owed more than $650,000.00 in unpaid invoices. DE 39-8. Dollar General also points to the deposition of Charles Armouth, in which the following exchange took place:

> Counsel: So do you think the first time you asserted a claim against Dollar General would have been when Mr. Farbman would have been involved?
>
> Armouth: Probably, yes. [Mr. Farbman] was hired to try to resolve this issue. He contacted [Dollar General's] lawyer, Rob Stephenson, and that dragged for a very long time.

DE 39-9 at 9.  As such, the April 29, 2013 letter from Mr. Farbman appears to have constituted the

first written or formal claim against Dollar General.  However, Armouth denies that this was the first

time it asserted a claim, DE 52 at 4, and correctly notes that the Quote Sheet language regarding the

temporal limitation does not require a formal assertion of a claim, nor does it require that an attorney

assert the claim.  DE 51 at 7.  Armouth also states that it was "in constant discussion with Dollar

General regarding the canceled scrub top purchase orders, the canceled scrub pants, and the unpaid

invoices."  *Id*. at 8.  Furthermore, Mr. Armouth stated the following during his deposition:

> Counsel:      Okay.  Let's move on – I'd like to understand when you first asserted
> a claim for the unpaid invoices, cancelled orders and the scrub top
> bottoms to Dollar General.
>
> Armouth:      On November 30th everything – everything stopped.    After
> November 30th, in January we tried – we had a meeting to try to
> resolve this.  It did not work.

DE 51-2 at 1-2.  Based on the failure of the Quote Sheet to specify how a "claim or demand is first

asserted," the Court finds that there is a genuine dispute as to the date on which Armouth first

asserted a claim against Dollar General, which should be resolved by the trier of fact.

Accordingly, the Court recommends that Dollar General's motion for partial summary

judgment be granted in part and denied in part.  Specifically, the Court recommends entry of an order

barring Armouth from recovery of incidental or consequential damages, and dismissing Armouth's

claim for unjust enrichment.  The Court further recommends that Dollar General's request that

Armouth's damages be limited to the purchase price of goods purchased between January 29, 2013

and April 29, 2013 be denied.

**B. Armouth's Motion for Partial Summary Judgment**

Armouth asserts that it is entitled to judgment as a matter of law as to liability in this matter. DE 44 at 1. Armouth further claims that Dollar General's counterclaim should be dismissed because Dollar General "was the first to breach the contracts," thereby waiving any claims for breach of contract or breach of warranty. *Id*. at 2. Armouth argues (1) that Dollar General breached the parties' agreement with respect to scrub tops, and (2) that Dollar General breached the parties' agreement with respect to scrub pants. The Court will address each point separately.

### 1. Alleged breach of contracts for scrub tops.

It is undisputed that in April and August of 2011, Dollar General issued Purchase Orders to Armouth for eighteen different styles of scrub tops to be delivered beginning in early 2012. DE 53-15 at 2. It is further undisputed that on November 30, 2011, Dollar General cancelled these Purchase Orders. *Id*. at 3. Dollar General claims that it first "requested that Armouth slow down its production and reflow the goods slated for delivery to Dollar General," and only cancelled the Purchase Orders after Armouth refused to do so. *Id*. Nevertheless, the Purchase Orders were cancelled on November 30, 2011. *Id*. Dollar General then "placed [the orders] on a replenishment program" on January 18, 2012, meaning that the scrub tops already committed for purchase by Dollar General would be stored in Dollar General's distribution centers and moved to its retail stores only when such stores needed to be restocked with the scrub tops. *Id*. at 4. Dollar General denies that it had any obligation to accept delivery of the scrub tops after cancelling the Purchase Orders. *Id*. The issue is therefore whether Dollar General breached any contract by cancelling these orders.

If the language contained in a contract is plain and unambiguous, the Court must determine the parties' intention from the four corners of the contract, interpreting and enforcing it as written. *Heritage Bank v. Holt*, No. 3:13-CV-0719, 2014 WL 2515404, at *3 (M.D. Tenn. June 4, 2014) (citing *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000)). Section eight of the Purchase Orders issued by Dollar General explicitly states that "[Dollar General] shall have the right at any time, without cause, to terminate all or any part of the undelivered portion of this Order, effective upon written notice to [Armouth]." DE 39-2 at 27. Armouth admits that it was bound by the terms of these Purchase Orders. DE 52 at 3. Armouth admits that it received written notice of cancellation of the Purchase Orders for scrub tops on November 30, 2011. DE 44 at 14. Armouth argues, however, that Dollar General's cancellation of these Purchase Orders "completely deprived Armouth of the benefit which it reasonably expected–payment for the manufacture and sale of scrub tops–and left Armouth in possession of mass quantities of scrub tops." *Id*. Nevertheless, this does not negate the right of Dollar General to cancel the Orders after providing written notice to Armouth pursuant to the terms of the Purchase Orders.

As previously discussed, Dollar General redirected the remaining scrub tops from the cancelled Purchase Orders to its replenishment program. DE 53 at 3. Dollar General planned to issue new Purchase Orders for the remaining scrub tops from these cancelled orders as needed to replenish its retail stores. *Id*. Dollar General argues that it intended to purchase all of the scrub tops from these cancelled orders even though "it had no obligation to do so." *Id*. Dollar General began issuing new Purchase Orders for the scrub tops in June of 2012, and continued until Dollar General received test results indicating that Armouth's scrub tops "failed to comply with federal labeling requirements." *Id*. Specifically, Dollar General's testing revealed that Armouth's scrub tops

violated 15 U.S.C. § 70b and 16 C.F.R. § 303.43, which require that the "content listed on each garment's label match the actual content of the garment." DE 39-1 at 4. Armouth does not dispute that its scrub tops were noncompliant with these federal standards, and instead argues that the test results "are irrelevant because Dollar General had already materially breached the contract with Armouth." DE 44 at 16. Armouth is correct with respect to the relevancy of the noncompliance of its scrub tops for purposes of its motion for summary judgment, as the relevant issue is whether Dollar General was entitled to cancel the Purchase Orders on November 30, 2011 and reissue Purchase Orders for the scrub tops.

Dollar General clearly retained the right, pursuant to the language of the original Purchase Orders issued in April and August of 2011, to cancel said orders upon written notice to Armouth. DE 39-2 at 27. Armouth acknowledges that it received written notice of this cancellation on November 30, 2011. DE 53-15 at 3. Armouth instead argues that Dollar General "cannot support its position that the Purchase Orders were revised and reissued," DE 44 at 15, which is based on two of Dollar General's responses in its answer to Armouth's complaint, in which Dollar General stated that the Purchase Orders in question were "revised and reissued by agreement of the parties." DE 10 at 3. Armouth argues that Dollar General failed to provide any signed writing that would serve as a modification or amendment of the Purchase Orders for the scrub tops, and therefore, under Tenn. Code. Ann. § 47-2-209(2), the parties never entered into an enforceable agreement to modify the Purchase Orders in question.[12] DE 44 at 15-16.

---

[12] Although its argument centers on the Purchase Orders for the scrub tops, Armouth quotes the terms and conditions from the Quote Sheets. DE 44 at 15-16.

The Court acknowledges that this was a curious position for Dollar General to assume in its answer, as it has since clearly taken the position that the Purchase Orders in question were properly cancelled, and not revised. DE 53-15 at 3. However, Armouth's argument regarding modification attempts to circumvent the fact that Dollar General retained the contractual right to cancel, not modify or revise, the Purchase Orders on November 30, 2011. Dollar General makes no assertions in its motion for summary judgment nor its response to Armouth's motion for summary judgment that the November 30, 2011 Purchase Orders were modified. Instead, Dollar General consistently asserts that it exercised its contractual right to *cancel* the Purchase Orders on November 30, 2011. DE 39-1 at 6; DE 53 at 2-3, 10-12; DE 53-15 at 1, 3-4. Dollar General explicitly states in its response to Armouth's motion that "[b]ecause the Purchase Order terms and conditions give Dollar General the right to unilaterally cancel all or part of a purchase order for any reason prior to the goods being shipped, whether or not a quote sheet may be modified is irrelevant." DE 53 at 12, n.3. The Court agrees that any argument regarding modification of a contract represents either an unnecessary distraction from Dollar General's right to cancellation or a conflation of issues. Additionally, although Dollar General's answer stated that the Purchase Orders had been "revised and reissued," Dollar General also included an affirmative defense in its answer which asserted that "[a]ny cancellation of contract by [Dollar General] was proper under Tennessee law." DE 10 at 6.

Despite the foregoing, Armouth pivots from the arguments contained in its memorandum in support of its motion for summary judgment, and argues in its reply to Dollar General's response that section eight of the Purchase Order, which includes Dollar General's right to cancel, is either an illusory promise or an unconscionable provision. DE 56 at 2-6. Armouth did not plead unconscionability or discuss illusory promise in either its amended complaint, DE 30, or its answer

to Dollar General's counterclaim. DE 16. Additionally, Armouth specifically alleged in its amended complaint that the Purchase Orders at issue represented "valid and enforceable contracts." DE 30 at 5, 7. Armouth also referred to the Purchase Orders as "enforceable contract[s]" in its memorandum in support of its motion for summary judgment. DE 44 at 13. Armouth did not argue that section eight of the Purchase Orders represented either an illusory promise or an unconscionable provision at any point in the memorandum. The only other reference to this argument is found in a footnote in Armouth's response to Dollar General's motion for summary judgment.[13] DE 51 at 9, n.6. Thus, the first substantive argument made by Armouth regarding unconscionability appears in its reply to Dollar General's response to its motion for summary judgment.

Unfortunately, there appears to be a dearth of Tennessee case law pertaining to allegations of unconscionability in contracts involving the purchase of goods. However, the Tennessee Court of Appeals has held that an employee's failure to plead the affirmative defense of unconscionability in his answer to a former employer's complaint alleging breach of employment contract constituted waiver. *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448, 460-61 (Tenn. Ct. App. 2009). Similarly, the United States District Court for the Eastern District of Tennessee has implied that a party's failure to plead unconscionability can lead to dismissal of an unconscionability claim. *AGFA Photo USA Corp. v. Parham*, No. 1:06-CV-216, 2007 WL 1655891, at *10 (E.D. Tenn. June 5, 2007) ("[I]f [the defendant] fails to plead the elements of these claims in detail, including the specific allegations pertaining to unconscionability, this Court may dismiss these claims with prejudice."). The Tennessee Court of Appeals emphasized the purpose of the pleading requirements in the

---

[13] Armouth did not, however, discuss unconscionability in the footnote, instead stating that "the right to cancel at any time for any reason would be an illusory promise and is wholly unenforceable for lack of consideration. *See* 2-5 Corbin on Contracts § 5.28." DE 51 at 9, n.6.

Tennessee Rules of Civil Procedure, including those pertaining to affirmative defenses as contained in Rule 8.03, which is to "provide the parties and the trial court with notice of the claims and defenses involved in the case." *Guiangan*, 309 S.W.3d at 460 (quoting *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 300 (Tenn. Ct. App. 2001)). This Court has previously discussed a similar purpose with respect to the affirmative defense pleading requirements found in Rule 8(c) of the Federal Rules of Civil Procedure: "[t]he purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it." *Lindley v. Am. Home Mortgage Servicing, Inc.*, No. 3:10-1108, 2012 WL 5877947, at *2 (M.D. Tenn. Nov. 20, 2012) (quoting *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993)).

In the instant case, the Court believes that Armouth has waived its right to assert a claim of unconscionability or illusory promise with respect to section eight of the Purchase Orders at issue. As previously discussed, Armouth alleged in both its complaint and amended complaint that Dollar General unilaterally cancelled "valid and enforceable" Purchase Orders on November 30, 2011. DE 1 at 4-5; DE 30 at 5. Dollar General responded in its answer and counterclaim by asserting that any such cancellations were "proper under Tennessee law." DE 10 at 6. In its answer to Dollar General's counterclaim, Armouth puts forth several broad affirmative defenses, including claims that "[Dollar General's] claims are barred by their course of dealing," and "[Dollar General's] claims are barred by their lack of good faith and fair dealing." DE 16 at 4-5. Armouth did not, however, raise the issue of unconscionability in its answer, which must be specifically pled. *See Guiangan*, 309 S.W.3d at 460 ("To read a pleading that asserts only violation of public policy as implicitly including unconscionability would be contrary to both the language and purpose of Rule 8.03.").

Even if Armouth had not been required to raise the issue of unconscionability in its pleadings, Armouth failed to make the argument that section eight of the Purchase Order was unconscionable until its reply to Dollar General's response to its motion for summary judgment. Armouth did not present this argument in its preceding motion for summary judgment, instead asserting that the Purchase Orders represented "enforceable contract[s]." DE 44 at 13-14. Significantly, although Dollar General clearly asserted in its motion for summary judgment that it had a contractual right to cancel the Purchase Orders, DE 39-1 at 6, Armouth did not raise the issue of unconscionability in its response. Armouth instead stated in a footnote that such a right would represent an illusory promise and unenforceable provision. DE 51 at 9, n.6. Notwithstanding Armouth's subsequent statement that it "has always maintained the position that [section eight] is unenforceable," DE 56 at 2, n.1, this was the first indication by Armouth that it disputed the enforceability of the provision. This is particularly surprising in light of Armouth's decision to devote an entire section of its response to the argument that the three-month temporal limitation contained in the Quote Sheets regarding damages was unconscionable. DE 51 at 1, 6-7. Instead, Armouth attempts to bolster its motion for summary judgment by asserting for the first time in its reply that section eight of the Purchase Orders constitutes an unconscionable provision. In doing so, it effectively prevented Dollar General from responding to the allegations of unconscionability. Such action violates the spirit of both Fed. R. Civ. 8(c) and Tenn. R. Civ. P. 8.03 because it fails to "provide the parties and the trial court with notice of the claims and defenses involved in the case," *Guiangan*, 309 S.W.3d at 460 (internal citation omitted), and prejudices Dollar General's ability to respond. *See Lindley*, 2012 WL 5877947, at *2 ("defendant does not waive an affirmative defense if the defense is raised at a time when plaintiff's ability to respond is not prejudiced[.]") (internal

24

citation omitted). The Court therefore finds that Armouth has waived its right to assert a claim of unconscionability or assert that section eight of the Purchase Orders contained an illusory promise.

Alternatively, even if it were determined that Armouth timely raised the issue of unconscionability, the Court finds that section eight is a valid and enforceable provision agreed to by Armouth. The determination of whether a contractual provision is unconscionable is a question of law. *Id*. at 461 (internal citations omitted). This determination is based on the circumstances as they existed at the time the parties executed the contract in question. *Id*. (citing Restatement (Second) of Contracts § 208 (1981)). Unconscionability is categorized as either procedural, which involves a party's lack of meaningful choice, or substantive, which involves unreasonably harsh contractual terms. *Trinity Indus., Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159, 170 (Tenn. Ct. App. 2001) (internal citation omitted). Courts in Tennessee, however, have "tended to lump the two together," and find that unconscionability arises

> when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

*Id*. at 171 (citing *Haun v. King*, 690 S.W.2d 869 at 872 (Tenn. Ct. App. 1984)). Additionally, "[w]here the parties possess equal bargaining power the courts are unlikely to find that their negotiations resulted in an unconscionable bargain[.]" *Id*. (internal citation omitted).

As discussed *supra*, the contractual provision in section eight that is alleged to represent either an unconscionable clause or an illusory promise states that "[Dollar General] shall have the right at any time, without cause, to terminate all or any part of the undelivered portion of this [Purchase] Order, effective upon written notice to [Armouth]." DE 39-2 at 27. Armouth points to

this Court's decision in *Armistead v. Vernitron Corp.*, in which it was held that "reading into the agreement a clause permitting [Defendant] to terminate all benefits programs . . . would render illusory [Defendant's] promise to provide these benefits." *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1296 (6th Cir. 1991), *abrogated by M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 190 L. Ed. 2d 809 (2015). There are significant differences, however, in that case and the instant matter. For one, the plaintiffs in *Armistead* were retirees who had been deprived of health and life insurance benefits from their former employer. *Id*. at 1290. Despite describing itself as a "microscopic fish with little to no bargaining power," DE 56 at 5, Armouth, an international company, can hardly equate its business relationship with Dollar General to the relationship between an employee and employer, and provides no evidence that bargaining power was unequal. *See Book Mart of Florida, Inc. v. Nat'l Book Warehouse, Inc.*, 917 S.W.2d 691, 694-95 (Tenn. Ct. App. 1995) (distinguishing contract between two businesses from employer and employee relationship). Armouth and Dollar General are both large and sophisticated businesses possessing equal bargaining power. *Trinity Indus., Inc.*, 77 S.W.3d at 171. In a case much more similar to the instant scenario than *Armistead*, the Sixth Circuit upheld a purchase order that granted one party the right to terminate the order at any time:

> The parties here were experienced businessmen who executed a large number of valuable contracts. From the outset [plaintiff] was on notice that [defendant] had the unilateral right to terminate at anytime. It accepted this risk when it signed the agreement. Although that risk has now resulted in economic hardship, [plaintiff] may not here represent itself as an untutored victim of sharp business practices.

*Cardinal Stone Co. v. Rival Mfg. Co.*, 669 F.2d 395, 396 (6th Cir. 1982).

Additionally, and more significantly, the *Armistead* decision emphasized the defendant employer's failure to provide notice to the employees of the termination of their benefits. *Armistead,*

944 F.2d at 1296 ("[Defendant] has . . . attempted to exercise . . . a unilateral power to terminate the entire benefits plan without so much as even giving notice to the plaintiffs that they were doing so."). The Court also noted that, "[i]f a promisor reserves the power to cancel at any time *without notice*, his promise seems to be unenforceable . . . ." *Id.* (emphasis added) (quoting Corbin on Contracts § 163 at 237 (1952)). In the instant case, Dollar General's right to cancel was explicitly subject to written notice to Armouth. DE 39-2. It provided such notice to Armouth. DE 53-15 at 3. The Court thus rejects Armouth's reliance on the *Armistead* holding and finds that Dollar General's right to cancel did not constitute an illusory promise or unconscionable provision. Because Armouth has failed to demonstrate that Dollar General was not exercising a valid contractual right when it cancelled the Purchase Orders relating to scrub tops, Armouth's claim that it is entitled to summary judgment as to Dollar General's liability for alleged breach of the contracts for scrub tops should be denied.

### 2. Alleged breach of contracts for scrub pants.

Armouth next contends that Dollar General breached its contract to purchase scrub pants. DE 44 at 22-23. However, it must first be determined whether a contract for scrub pants was ever formed between the parties. Armouth claims that Dollar General entered into an agreement with Armouth for the sale of scrub pants via a series of emails between Charles Armouth and Jim Lorenz that began in October of 2011. DE 44 at 19. Dollar General denies, however, that Mr. Lorenz ordered any amount of scrub pants through these emails. DE 53 at 14-18; DE 53-15 at 10. Although the following sequence of events is discussed *supra*, the Court believes a more detailed discussion is warranted.

Mr. Lorenz's email on October 7, 2011 to Charles Armouth included a spreadsheet with rows for various quantities of scrub pants in three different colors and in several different sizes. DE 42-6 at 4. Two of the columns in the spreadsheet were titled, "DG [Purchase Order] Qty" and "Armouth Suggested Back-Up," respectively. *Id*. The former column listed a total quantity of 664,608 units, while the latter listed a total quantity of 682,890 units. *Id*. In the email, Mr. Lorenz requested that Mr. Armouth "take a look at" the quantities and "confirm that [Armouth] would be able to hit a January 15th [delivery date] to our [distribution centers] with the DG [Purchase Order quantity] as well as Suggested back-up in the event these take off like you have promised." DE 42-6 at 3. Mr. Lorenz then stated that "[w]ith confirmation and with quote sheets, we will get orders to you for this Domestic Core program straight away." *Id*. Dollar General denies that this email constituted an offer, characterizing it instead as a "general inquiry into whether Armouth would be able to accomplish certain delivery deadlines should orders be issued." DE 53 at 15.

On October 10, 2011, Mr. Armouth responded by stating, "[Armouth] can have available all your planned set order of [664,608] pieces by February 15, 2012. DE 42-6 at 3. He further stated that Armouth would be able to provide half of the suggested back-up quantities by March 15, 2012, and the other half by April 15, 2012.[14] *Id*. Of note, Mr. Armouth stated in the email that "[another Armouth employee] will follow this email with all the required quote sheets." *Id*. Mr. Armouth closed the email by stating, "please give us your green light so we can commence at once." *Id*. The following day, October 11, Mr. Lorenz responded by stating, "[t]hank you for your commitment to

_____

[14] Mr. Armouth lists March 15 and April 15, 2011 in his email. DE 42-6 at 3. However, given that the email was sent on October 10, 2011, the Court assumes Mr. Armouth was referring to March 15 and April 15, 2012.

the [664,608] for the roll-out. Please send the ship to sea!" DE 42-6 at 2. He also requested that

Armouth move up its previously stated delivery dates for the suggested back-up quantities:

> The cadence of the back-ups makes me very nervous! Any way to get that mid-April 300k in with the March? Or maybe move them each up by two weeks? 300k beginning of March and 300k beginning of April?

*Id*. Later on October 11, Mr. Armouth thanked Mr. Lorenz for his confirmation and advised that,

"I believe I'll be able to advance the back up quantities to March 1 and April 1." *Id*. Notably,

Mr. Armouth also states, "please advise sku numbers and pos," *id*., which appears to represent a

request that Dollar General provide stock-keeping unit numbers and Purchase Orders.

Armouth argues that this final email on October 11 to Mr. Lorenz cemented the formation

of a valid contract between the parties. DE 44 at 19. Dollar General responds that Mr. Armouth's

October 10 email, in which he stated that "[another Armouth employee] will follow this email with

all the required quote sheets," clearly indicates that no orders had been issued, and thus no contract

had been formed. DE 53 at 15. Notably, there is no discussion by Armouth regarding any Purchase

Orders that were issued subsequent to the October 11 email. Armouth explains that "[a]ny orders

placed with a purchase order and delivered to Dollar General are not complained about," and that

"[i]t is only the undelivered portion ordered in the . . . email chain and that are not subject to a

purchase order, that are complained about." DE 56 at 12. Dollar General explains that "any claim

for scrub pants relates solely to a portion of the 'Suggested Backup'" quantities included in the

emails between Mr. Lorenz and Mr. Armouth. DE 53 at 16. Therefore, Armouth appears to ask the

Court to find that there is no genuine dispute as to the formation of an enforceable contract via the

emails sent between Mr. Lorenz and Mr. Armouth regarding the quantity and delivery dates for the

"suggested back-up" quantity of scrub pants.

Viewing the facts in the light most favorable to Dollar General, the Court cannot agree with Armouth's position that the email chain between Mr. Lorenz and Mr. Armouth indisputably created an enforceable contract. Tennessee law holds that an enforceable contract must "result from a meeting of the minds and must be sufficiently definite to be enforced." *Jamestowne on Signal, Inc. v. First Federal Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990) (internal citations omitted). As Dollar General notes in its brief,

> [the] meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn.

*Id*. (internal citations omitted). In the instant case, there is substantial evidence suggesting that Dollar General did not intend for the email chain between Mr. Lorenz and Mr. Armouth to establish a contract. For one, Armouth has admitted that it was "required to agree to the Domestic Vendor Guide and use [Dollar General's] Quote Sheet and Purchase Orders to do business with [Dollar General]." DE 52 at 3. This indicates that Armouth understood that the normal course of business dealings with Dollar General required execution of Quote Sheets and Purchase Orders. This point is further demonstrated by Mr. Armouth's statement in his October 10 email to Mr. Lorenz that "[another Armouth employee] will follow this email with all the required quotes sheets." DE 42-6 at 3. Additionally, Mr. Armouth specifically requests in his October 11 email that Mr. Lorenz provide Purchase Orders. DE 42-6 at 2. This suggests Armouth intended to rely on the Purchase Orders as the enforceable contracts for the goods at issue. Armouth was undoubtedly familiar with the language contained in the Purchase Orders issued by Dollar General by this point, as Dollar General had previously issued Purchase Orders for scrub tops in both April and August of 2011,

DE 53-15 at 2.  Therefore, Armouth would have been aware of the following language contained in

the Purchase Orders:

> This Purchase order ("Order") *is an offer* by [Dollar General] to [Armouth], but is
> not a fixed offer and may be changed or revoked at any time. [Armouth] may accept
> this Order by (i) accepting it in writing, (ii) commencing performance, or
> (iii) engaging in any conduct that recognizes the existence of a contract related to this
> Order.  Acceptance of this Order by [Armouth] is expressly limited to the terms and
> conditions set forth in this Order and shall be without qualification.

DE 39-2 at 27 (emphasis added).  Armouth was therefore aware that the Purchase Order represented

the offer from Dollar General regarding the purchase of goods produced by Armouth, which

Armouth was then free to accept or reject.  This undermines any argument that either party, let alone

both parties, intended for the email chain to represent a binding contract with respect to any goods.

Additional communications also suggest that there was no meeting of the minds between the

parties regarding the suggested back-up quantity of scrub pants.  On October 27, Mr. Lorenz stated

the following to Mr. Armouth via email:

> Keep in mind that my commitment was to place orders for ~650k pcs to set stores
> and shore up [distribution centers] in February, knowing that [Dollar General's]
> suggestion/expectation was for Armouth to carry another ~600k pcs . . . How much
> and the timing of the replenishment orders for the Armouth ~600k pcs is driven
> solely by sales; *which leads to demand and, therefore, orders*.  Just keeping it all on
> the up and up.

DE 53-6 at 6 (emphasis added).  Armouth claims that this email indicates that Dollar General began

to "waver on the amounts and delivery dates."  DE 44 at 20.  However, the italicized portion of this

excerpt suggests that Purchase Orders would not be issued until there was demand for the suggested

back-up quantity.  Mr. Armouth appears to acknowledge this process in a response email, stating

"I'm extremely familiar with replenishment [a]nd the way it usually works . . . I am not really

worrie[d] about [t]he back up I'm actually very bullish [a]bout this program."   DE 53-6.

Furthermore, on October 28, 2011, Ms. Darden stated the following to Mr. Armouth with respect to the 664,608 set order quantity and the 682,890 suggested back-quantity:

> I told you when we started down this road that they were projections only . . . All along you told me that you were going to carry inventory for the purpose of flow, but that I was not committed. The quantities given to you were simply a projection of sales demand.

DE 53-2 at 11-12. These communications do not conclusively prove that a valid and enforceable contract was never established with respect to the suggested back-up quantity of scrub pants. However, the communications provide significant evidence to suggest that the requisite meeting of the minds never took place, which would thus preclude the formation of an enforceable contract with respect to the scrub pants.

The Tennessee Court of Appeals has held that an enforceable contract must involve "a meeting of the minds in mutual assent to terms, must be based upon sufficient consideration, must be free from fraud or undue influence, not against public policy and must be sufficiently definite to be enforced." *Jones v. LeMoyne-Owen Coll.*, 308 S.W.3d 894, 904 (Tenn. Ct. App. 2009). In addition to a lack of a meeting of the minds, the Court finds that the email chain at issue is not sufficiently definite to represent an enforceable contract. Even assuming that the October 11 email from Mr. Lorenz, in which he stated "[p]lease send the ship to sea," DE 42-6, formed an enforceable agreement with respect to the 664,608 set order, the delivery date for the suggested back-up quantity was never established. After Mr. Lorenz requested that the two delivery dates be moved up to early March and April, respectively, Mr. Armouth responded by stating, "I'll do my level best and I believe I'll be able to advance the back up quantities to March 1 and April 1." *Id*. The Court cannot agree that this optimistic response from Mr. Armouth constituted acceptance of a firm offer from

Dollar General, especially in light of Armouth's knowledge that Dollar General required the use of Quote Sheets and Purchase Orders to complete transactions. DE 52 at 3. The Court believes the email exchange in question constitutes an "ambiguous course of dealing between the two parties from which differing inferences . . . might reasonably be drawn," *Jamestowne on Signal, Inc.*, 807 S.W.2d at 564, and does not definitively establish the formation of a contract. Armouth has thus failed to meet its burden of showing the absence of a genuine factual dispute from which a reasonable jury could return a verdict for Dollar General in regards to the scrub pants. In light of this finding, the Court need not address Armouth's arguments regarding Dollar General's alleged breach, failure to accept delivery, or unpaid invoices. Accordingly, Armouth's motion for summary judgment should be denied.

## IV. RECOMMENDATION

For the above stated reasons, the Court respectfully RECOMMENDS that:

1) Dollar General's motion for partial summary judgment (DE 39) be GRANTED IN PART, and DENIED IN PART, as outlined above; and

2) Armouth's motion for partial summary judgment (DE 41) be DENIED.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*,

474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

BARBARA D. HOLMES
United States Magistrate Judge